FRANCIS J. McCALLIN et al., Individually and on Behalf of All Persons Similarly Situated, Respondents, v JEREMIAH T. WALSH, as Commissioner of the Buildings Department of the City of New York, et al., Appellants.

BECKROSE ESTATES et al., Respondents, v JOHN T. O'HAGAN, as Commissioner of the Fire Department of the City of New York, et al., Appellants.

49-50 ASSOCIATES et al., Respondents, v JOHN T. O'HAGAN, as Commissioner of the Fire Department of the City of New York, et al., Appellants.

MELVYN KAUFMAN et al., Respondents, v JOHN T. O'HAGAN, as Commissioner of the Fire Department of the City of New York, et al., Appellants.

First Department, July 20, 1978

48

### APPEARANCES OF COUNSEL

*Morris Einhorn* of counsel *(L. Kevin Sheridan* with him on the brief; *Allen G. Schwartz, Corporation Counsel),* for appellants.

*William M. Kufeld* of counsel *(Lewis Bart Stone, Jeffrey G. Gurren* and *Norman Flitt* with him on the brief; *Carb, Luria, Glassner, Cook & Kufeld,* attorneys), for Francis J. McCallin and others, respondents.

*Harold Dublirer* of counsel *(Dublirer, Haydon & Straci,* attorneys), for John T. O'Hagan and another, respondents.

*Jeffrey G. Stark* of counsel *(Bernard S. Meyer* with him on the brief; *Meyer, English, Cianciulli & Peirez, P. C.,* attorneys), for New York Sprinkler Contractor's Association, *amicus curiae.*

### OPINION OF THE COURT

Sullivan, J.

The issue presented on these four appeals is the constitu-

tionality of Local Law No. 5 of 1973 of the Local Laws of the City of New York, entitled "fire safety requirements and controls", which was enacted by the City Council "to amend the administrative code of the city of New York, in relation to fire safety requirements and controls in certain office buildings." The provisions of Local Law No. 5 are contained in two distinct sections of the Administrative Code of the City of New York, namely, chapter 26 ("Building Code") and chapter 19 ("Fire Prevention Code").

Four declaratory judgment actions were commenced challenging the constitutionality of Local Law No. 5 and its amendment, Local Law No. 26 of 1975, and seeking to enjoin its enforcement on the grounds that the law is unworkable, confiscatory and unnecessary. These actions also challenged various rules promulgated by the Fire Commissioner under the purported authority of the Fire Prevention Code provisions of Local Law No. 5. In one of these actions, the McCallin suit, class action status was granted.

After a joint trial, Trial Term declared certain sections of Local Law No. 5 and certain provisions of the fire department's fire drill and evacuation rules void and unenforceable, and permanently enjoined their enforcement.

Local Law No. 5, as well as its amendment, was, in part, a legislative response to two major fires which took place in New York City within a four-month period in late 1970. The first occurred at 1 New York Plaza and involved a 50-story office building. The second involved a 46-story office building at 919 Third Avenue. The property damage sustained in these two fires was in excess of $12,500,000. Five persons lost their lives. Over 100 people were injured. Investigation of these fires "raised serious questions regarding the adequacy of the city's fire safety requirements."[1] While these tragedies were the impetus for the enactment of Local Law No. 5, the need for ameliorative legislation was apparent for other reasons, as well. New technology developed after World War II in the construction of high-rise office buildings rendered pre-existing fire-fighting systems obsolete. Lightweight construction materials and sealed windows were only two of the factors which necessitated the promulgation of innovative fire-fighting techniques. Modern building methods utilized extensive open-floor

---

1. Report of Committee on Buildings, City Council of the City of New York, December 13, 1972. This report is part of the trial record.

areas which facilitated the rapid spread of fire and smoke. Central air conditioning and ventilating systems were conducive to increased circulation of smoke, toxic acid and flames throughout the structures. While these problems affected every major city, the concentration of skyscrapers in New York City made the need for remedial legislation particularly acute.

In February of 1971 the then Mayor of the City of New York appointed an Advisory Committee composed of representatives of the city's regulatory agencies, the construction industry, and real estate and labor organizations, to review the adequacy of existing code provisions on fire safety. Ten months later, after prolonged investigation of high-rise fires, studies of other building codes, and field testing, the Advisory Committee issued its final report[2] recommending "a set of comprehensive fire safety amendments to the fire, building and electrical codes," and a "set of regulations governing fire drills, fire safety plans, fire safety directors".

The report also emphasized that while necessary safety measures are most easily effected in a building's planning stage, "comparable measures are necessary for buildings already in existence but with a series of options and tradeoffs available," so as to permit compliance "without the imposition of costly new systems", pursuant to "a carefully staggered schedule." Recognizing that aerial ladders and exterior water pumps are ineffective above 10 stories, the Advisory Committee recommended greater reliance upon such interior fire-fighting techniques as "fire detection and interior alarm communication systems, a tightly restricted use of elevators in case of fire, and provision of systems of smoke and heat ventilation, pressurization and compartmentation to permit effective fire-fighting by confinement of conflagration to manageable areas." These recommendations were embodied in a bill introduced in the City Council.

Thereafter, in early 1972 extensive public hearings were held on the proposed legislation. Testifying were numerous representatives of the real estate and construction industry, the building-labor trades, and professional engineering and architectural organizations. After the conclusion of these hearings, Local Law No. 5 was adopted by the City Council and approved by the Mayor.

---

2. Report of Mayor's Advisory Committee on Fire Safety in High-Rise Buildings. This report is part of the trial record.

Local Law No. 5 is applicable to all occupancy group E buildings (that is, in general, buildings occupied for business), including existing buildings. Some of the provisions are applicable only to those group E buildings 100 feet or more in height; others to those occupied by 100 persons above or below street level, or more than 500 persons in the entire building; and certain provisions apply to buildings with air-conditioning equipment circulating air mechanically from floor to floor through ventilating systems.

Local Law No. 5 contains three basic requirements: a fire safety plan to organize and effect evacuation from perilous areas without panic; an alarm-communications system, including elevator recall, to alert occupants to danger and to direct safe evacuation and effective internal fire fighting; and, in centrally air-conditioned buildings, either complete sprinklering, or both subdivision of open-floor areas with fire-resistant partitions (known as compartmentation), and a system of smoke control to provide for safe evacuation.

### FIRE SAFETY PLAN

Local Law No. 5 amends chapter 19 of title C (Fire Prevention Code) of the city's Administrative Code by adding section C19-161.2 which requires occupancy group E buildings and "any existing office building" occupied by 100 persons above or below street level or more than 500 persons throughout to provide a fire safety plan "for fire drill and evacuation procedures in accordance with the requirements of the commissioner" (Local Law. No. 5, § 1). Such plan must be approved by the Fire Commissioner, and its applicable portions distributed to all tenants and building service employees. "All occupants of the building shall participate and cooperate in carrying out the provisions" and building service personnel are to conduct fire drills semiannually, and provide a Fire Safety Director, as well as a fire brigade for fire control pending arrival of the Fire Department. "[W]here compliance would cause practical difficulty or undue hardship, the commissioner may waive or modify the requirements of this subdivision and accept alternatives" (Local Law No. 5, § 1).

Signs are also required at all elevator landings advising occupants to "use the stairs unless otherwise instructed." These signs must contain a diagram showing the location of the stairs. Signs must also be posted on each side of stairwell doors, identifying the floor as well as points of re-entry from

the stairwell. A further provision set forth the conditions to be met before doors opening into interior stair enclosures could be locked for security reasons.

### ALARM-COMMUNICATION AND ELEVATOR RECALL

Local Law No. 5 amends the building code (Administrative Code, § C26-1704.5) to require that occupancy group E buildings 100 feet or more in height, and existing high-rise office buildings 100 feet or more in height, "shall be provided with a class E fire alarm signal system" to consist of "an interior fire alarm and voice communicating system" connected to a fire command station in the lobby (Local Law No. 5, § 25). When a fire or smoke detector is activated on any floor, an alarm must be sounded throughout that floor and the floor above, and the Fire Department notified. At each elevator landing a detector must be installed to override "car stops of all automatic elevators serving the floor where activated and bring them non-stop" to their terminal floors (Local Law No. 5, § 25). In addition to permitting existing alarm or communication systems to be incorporated into the required system, "[i]n existing office buildings 100 feet or more in height where compliance would cause practical difficulty or undue hardship, the commissioner may waive or modify" these requirements "and accept alternatives" (Administrative Code, § C26-1704.5, subd [f], par [11]; subd [g], par [11]; Local Law No. 5, § 25).

The required communications system provides for loudspeakers on each floor and a two-way voice communication between a fire command station in the lobby and a designated floor warden station on each floor. A certain number of elevators in readiness are to be kept for Fire Department use (Administrative Code, § C26-1800.8; Local Law No. 5, § 31).

Compliance with the alarm-communication and elevator-in-readiness provisions of the local law is required within three years of its effective date, while a planned time schedule must be submitted to the commissioner for approval within 18 months (Local Law No. 5, §§ 25, 30, 31).

### AIR-CONDITIONED BUILDINGS

Local Law No. 5 also provides that unsprinklered floor areas, more than 40 feet above curb level, in existing buildings 100 feet or more in height "having air-conditioning and/or mechanical ventilating systems that serve more than the

floor on which the equipment is located" shall be subdivided by one-hour fire-resistive separations into compartments not to exceed 7,500 square feet which "may be increased to not more than 15,000 square feet", if protected by detectors and two-hour fire-resistive partitions (Administrative Code, § C26-504.1; Local Law No. 5, § 6). It is expressly specified that regardless of the floor area, no subdivision of the floor area shall be required "when complete sprinkler protection is provided" (Administrative Code, § C26-504.1; Local Law No. 5, § 6).[3] Compartmentation of unsprinklered areas is to be effected within 15 years, i.e., one third every five years, and where compliance "would cause practical difficulty or undue hardship, the commissioner may waive or modify the requirements * * * and accept alternatives fulfilling the intent of these requirements" (Administrative Code, § C26-504.1; Local Law No. 5, § 6).

One of the major features of the new law is the smoke and heat venting provision which requires that existing unsprinklered high-rise office buildings with air conditioning as hereinbefore described must also provide at least one smoke shaft through which smoke and heat can be vented to the outdoors. In lieu of the smoke shaft, all interior enclosed stairs in such buildings shall be provided with a system of stair pressurization,[4] which, when activated in fire emergency, would create an air flow of sufficient force or pressure to prevent smoke from entering. The smoke shaft requirement, because of the expense inherent, is concededly envisioned as being feasible only in new structures.

The pressurization requirement was to be in conformity with a system as provided in a Reference Standard (RS 5-18) to be promulgated by the Building Commissioner. The law also mandated the Building Commissioner to submit an amendment to the Reference Standard for such stairwell pressurization system within 18 months to "reflect the latest technological data and conclusions obtainable from tests of pressurization systems" (Administrative Code, § C26-504.15;

---

3. To minimize the cost of sprinklering existing office buildings, Local Law No. 5 provides that existing "standpipe risers may be used to supply water to sprinklers in * * * existing office buildings", rather than providing separate risers to carry water to sprinkler heads on each floor (Administrative Code, § C26-1702.14, subd [d]; § C26-1703.9; Local Law No. 5, §§ 14, 20, 38).

4. In its simplest form stair pressurization involves use of a high powered fan at the bottom and exhaust mechanism at the top of a stairwell. (Such system is apparently in use at the World Trade Center.)

Local Law No. 5, §§ 7, 33). Local Law No. 26 of 1975, however, extended the time by which the Building Commissioner was to submit this amendment to reflect test results on stairwell pressurization to February 7, 1976. It also extended the times by which building owners were to comply with the stairwell pressurization requirements to August 7, 1977 and by which to submit a plan and time schedule for the performance of such requirements to August 7, 1976.

In all, it would appear that approximately 870 office buildings in the City of New York are affected by this legislation, of which only 40% (350 buildings) have air-conditioning equipment circulating air mechanically from floor to floor through ventilating systems. Under this legislation an owner of the latter type building could either install sprinklers to extinguish a fire at its inception, or partition open-floor areas to retard the spread of the fire and provide safe egress by a system of smoke control. Prior to the enactment of Local Law No. 5, approximately 20% of the 350 air-conditioned buildings had already been fully sprinklered.

The smoke shaft for which Local Law No. 5 provided is a massive vertical shaft or chimney penetrating the entire height of the building, with duct work extending throughout each floor. Dampers located throughout the duct work would seal off the system when it is not in use. Because of the impracticability of installing smoke shafts in existing buildings, the alternative provided by Local Law No. 5 was stairwell pressurization. As already noted, sprinklered buildings are exempt from the requirement of smoke-free stairwells.

Trial Term invalidated just about every major fire safety innovation required by Local Law No. 5 except for the requirement of signs and elevator recall. While upholding the fire safety plan provisions, the court found that the City Council had failed to authorize the "conscription of private citizens as fire wardens and deputy fire wardens." Thus, the court held, the Fire Commissioner was powerless to require tenants to appoint employees to search and clear occupied areas during a fire emergency and its rules to that effect were void and unenforceable. On the other hand the court found that the cost of required signs and elevator recall was not unreasonable or confiscatory and upheld those provisions. The alarm-communication system was invalidated on the ground that the statutory period for compliance of three years was inadequate. The court rejected sprinklerization as an alternative to the

smoke shaft and stairwell pressurization options applicable to air-conditioned buildings, and further found a disproportionate relationship between cost and benefit.

The court held that the requirement for partitioning over a 15-year period would impose an unreasonable burden without contributing significantly to fire safety and that the large-scale construction which it entailed would itself constitute a significant fire hazard and thus "vastly outweigh the limited contribution to fire safety."

As for stairwell pressurization, the alternative to the smoke shaft in unsprinklered air-conditioned buildings, the court found that the installation of such a system would require a massive construction program in occupied high-rise buildings which would be hazardous to the working population in those buildings. The court also found that the city's testing prior to the adoption of RS 5-18 was inadequate and that the technical integrity of RS 5-18 was suspect because the law provided for its amendment. Relying upon both the changes proposed in the amendment and the results of testing conducted by the building owners, the court found that the criteria set forth in RS 5-18 were largely unworkable and unreliable. The court further found that there was no proof that stairwell pressurization would make high-rise buildings any safer and it concluded that the cost required for the installation of such a system was unjustified.

In summary, Trial Term's determination was based upon the premise that plaintiffs had available to them limited options in order to comply with Local Law No. 5; that these options were disproportionately costly to the benefits to be gained; that there was inadequate time provided for compliance; and that stairwell pressurization was technologically unsound and therefore unfeasible. In question are the partitioning requirement, the Fire Drill and Evacuation Rules, and the stairwell pressurization and alarm-communication systems.

As already noted Trial Term held that Local Law No. 5 did not provide for the utilization of a sprinkler system as an alternative to smoke shafts and stairwell pressurization. By so ruling, it stripped the statute of one of the options available to owners of existing buildings. For some inexplicable reason, the City Council used the word "exempt" when referring to the sprinkler system. Section 6 of Local Law No. 5 (compartmentation) provides that "no subdivision of the floor

area shall be required * * * when complete sprinkler protection is provided". Section 7 of Local Law No. 5 (smoke and heat venting) provided that "[e]xisting buildings that are sprinklered throughout shall be exempt from the smoke shaft and stair pressurization requirements." Local Law No. 26 of 1975 amended section 7 to provide that "[a]n existing building which is to be sprinklered throughout shall be exempt from the smoke shaft and stair pressurization requirements" (Administrative Code, § C26-504.15, subd [c]).

■ The city concedes that the smoke shaft alternative to stairwell pressurization is applicable only to new construction. Trial Term, therefore, found that if sprinklerization is not an option but rather an exempt situation under the statute, then there is no alternative to stairwell pressurization, inasmuch as the smoke shaft system applies only to new construction.[5] This is, of course, a play on words. There is nothing in the language of Local Law No. 5 of 1973 and Local Law No. 26 of 1975 to suggest that sprinklerization was not deemed an alternative to the other two smoke control options. Nor does the use of the term "exempt" mandate such a conclusion. Indeed, the legislative history of Local Law No. 5 shows that complete sprinkler installation was perceived as being in lieu of smoke shafts and stair pressurization.

Trial Term saw the basic issue as "whether certain provisions of Local Law 5 [would] indeed contribute to achieving greater public safety, and whether the plaintiffs are capable of complying with certain of the provisions of that Law within the periods specified therein."

In reliance upon the principle that due process bars an unreasonable exercise of the police power, Trial Term, citing *Lochner v New York* (198 US 45) and *Matter of Mt. Sinai Hosp.* (250 NY 103), declared the statute, subject to certain exceptions already noted, unconstitutional.

■ We conclude that Local Law No. 5 is the product of a reasonable exercise of the police power. Its contribution towards the achievement of public safety in high-rise office buildings and the capability of building owners to comply with its requirements are matters, we believe, which are best left for legislative insight, not judicial hindsight.

---

5. Needless to say, plaintiffs channeled a substantial amount of their proof and advocacy toward a demonstration that the requirement of stairwell pressurization is unconstitutional.

■ It is a well-established principle that a Legislature may, as a proper exercise of the police power, require building owners to make improvements essential to the reduction of fire hazards. *(Queenside Hills Co. v Saxl,* 328 US 80; *Nettleton Co. v Diamond,* 27 NY2d 182; *Wasmuth v Allen,* 14 NY2d 391; *People v Kaye,* 212 NY 407; *Tenement House Dept. v Moeschen,* 179 NY 325, affd 203 US 583; *English v Town of Huntington,* 448 F2d 319, 323.)

Even though experts may differ as to the most appropriate way to cope with fire hazards "[i]t is for the legislature to decide what regulations are needed to reduce fire hazards to the minimum." *(Queenside Hills Co. v Saxl, supra,* p 83.) Courts should be wary of substituting their economic and business judgment for that of legislative bodies, and should avoid the temptation, however attractive, to sit as a "super-legislature to weigh the wisdom of legislation". *(Day-Brite Light. v Missouri,* 342 US 421, 423.)

■ The *Lochner* doctrine—that due process authorizes courts to strike as unconstitutional laws which they find are the result of unwise legislative action—has been discarded and is no longer a valid constitutional concept. *(Ferguson v Skrupa,* 372 US 726, 730.) Nor does it represent the law of this State. (See *Nettleton Co. v Diamond, supra;* see, also, *Wasmuth v Allen, supra.)*

In *Queenside Hills Co. v Saxl (supra,* pp 82-83), the United States Supreme Court stated: "Little need to be said on the due process question. We are not concerned with the wisdom of this legislation or the need for it * * * Protection of the safety of persons is one of the traditional uses of the police power of the States. Experts may differ as to the most appropriate way of dealing with fire hazards * * * But the legislature may choose not to take the chance that human life will be lost * * * and adopt the most conservative course which science and engineering offer. It is for the legislature to decide what regulations are needed to reduce fire hazards to the minimum. Many types of social legislation diminish the value of the property which is regulated. The extreme cases are those where in the interest of the public safety or welfare the owner is prohibited from using his property * * * We are dealing here with a less drastic measure. But in no case does the owner of property acquire immunity against exercise of the police power because he constructed it in full compliance with the existing laws * * * The police power is one of the

least limitable of governmental powers, and in its operation often cuts down property rights * * * The question of validity turns on the power of the legislature to deal with the prescribed class."

▇ Furthermore, the danger to which a valid exercise of police power must relate "need only be reasonably apprehended." *(Wiggins v Town of Somers,* 4 NY2d 215, 218-219; see *Matter of Stubbe v Adamson,* 220 NY 459, 469-471.) It cannot be seriously argued that the alterations or installations proposed under this legislation are not reasonably calculated to attain their objective of fire safety. Thus, extra-legislative hearings to determine whether this enactment would contribute to achieving greater public safety were inappropriate.

▇ While Trial Term repeatedly stated that compliance with Local Law No. 5 would be extremely costly and "would impose an unreasonable burden upon the plaintiffs without contributing significantly to fire safety," it made no attempt to compare the cost of compliance with the full value of any affected parcel, or even its assessed value; although that is the test often used in instances where the validity of a law requiring additional facilities to assure public health and safety is challenged. (See *Oriental Blvd. Co. v Heller,* 27 NY2d 212, 221; *Tenement House Dept. v Moeschen,* 179 NY 325, 333-334, affd 203 US 583, *supra; Health Dept. of City of N. Y. v Rector of Trinity Church,* 145 NY 32, 40-43.)

More than a half-century ago, when a fire disaster led to adoption of new fire safety measures, this court had occasion to state: "no degree of hardship can justify the court in nullifying legislative enactments embodying the will of the people * * * The mere fact that the law cannot be enforced without causing expense to the citizen who comes within its provisions, furnishes no constitutional obstacle to such enforcement." *(Cockcroft v Mitchell,* 187 App Div 189, 194, affd 230 NY 630.) The court further stated (p 203) that "[a] decline in real estate values is no reason for exempting a building from the expense necessary to make it safe from fire. If such a rule were adopted it would be impossible for the city to enforce any building laws involving the expenditure of money, excepting in times when real estate values were high."

It would appear that nearly 900 high-rise buildings are affected by Local Law No. 5. In *Tenement House Dept. v Moeschen (supra),* 9,000 buildings were affected by a new building code requirement for the installation of water closets.

Despite the fact that the average cost of compliance ranged from 10 to 15% of the property's value, the law was upheld as a valid exercise of the police power. "[I]t is obvious that the full market value of the property, and not the value above incumbrances, should be taken into consideration when estimating the reasonableness of the proposed outlay to which defendant is to be subjected." (179 NY, at p 333-334.)

In *Queenside Hills Co. v Saxl* (328 US 80, *supra*), there was no constitutional infirmity in enacting a statute which necessitated the installation of a sprinkler system at a cost equal to 30% of the property's assessed value.

As already noted, no attempt was made to relate the cost of compliance to capital investment, market value or even assessed value of all the buildings affected or to any particular property. Trial Term's findings were limited to an estimation of the cost of compliance per square foot and the gross cost to the industry as a whole. Clearly, this is not the test of an unconstitutional taking. The effect of a law on the economics of a particular property, rather than its impact on an industry generally, determines whether regulation constitutes confiscation. (See *Oriental Blvd. Co. v Heller*, 27 NY2d 212, *supra;* see, generally, 1 Rathkopf, Law of Zoning [3d ed], ch 6.) In their brief defendants have performed the calculation necessary to relate costs to capital investment, using plaintiffs' figures and the cost estimates adopted by the trial court.[6] The tabulation shows that the cost ranged from 2.2% of assessed valuation to 9%, with most of the percentages in the 3½ to 4½% range.[7] No one disputes the economic burden which compliance with Local Law No. 5 imposes on building owners. However, this record clearly demonstrates that the costs are not so onerous as to render this legislation invalid.

---

6. The one exception is the figure used for the cost of sprinklering. Trial Term found this cost to be between $1.10 and $2.50 per square foot on the basis of an estimate made by a witness for plaintiffs for five floors of the witness' buildings. In doing so, Trial Term ignored the testimony of defendants' expert that his *actual* costs in sprinklering one to seven floors in nine existing buildings were less than $1 per net square foot and also ignored the testimony of another of plaintiffs' witnesses that sprinkler costs range from $1—$1.35 per square foot. In preparing their calculations, defendants have used a figure of $1 per *gross* square foot for sprinklering, which is approximately 25% higher than the actual costs testified to by defendants' expert, which were based on a *net* square foot basis (gross square footage is approximately 25% greater than new square footage).

7. Even if a figure of $2.50 per square foot were used for sprinklering, which is the optimum of Trial Term's estimated range, the average ratio of cost to assessed valuation would be less than 10%.

■ Trial Term found the requirement of stairwell pressurization unconstitutional due to the enormous expense and because the proof showed "the criteria set forth in RS 5-18 to be largely unworkable and unreliable." Hence, the court concluded that it would be unreasonable to compel compliance on the faint hope that the system would prove workable. The finding of unworkability was apparently based on the testimony of plaintiffs' witness who adopted every broadening of the performance criteria set forth in the proposed amendment of RS 5-18 as a basis for criticism of the Reference Standard. The pressurization systems required by Local Law No. 5 must comply with RS 5-18, a Reference Standard enacted into the Administrative Code and having the force of law. RS 5-18 is not a prescriptive standard—setting forth in detail the manner in which one must comply. It is a performance standard, merely stating the results to be achieved without detailed description of the manner in which to achieve them.

Before passage of Local Law No. 5 the city conducted tests as to the technical efficiency of stairwell pressurization, a system that had repeatedly been proven workable in other tests and had been incorporated into other building codes. Experts representing the New York Board of Fire Underwriters were among the observers. The city's test, conducted by the Polytechnic Institute of New York, also showed the system to be technically sound. Building owners in New York City were then afforded an opportunity to conduct their own test. That test consisted of the installation of a single blower in a 42-story building in an attempt to duplicate the test previously conducted for the city in a far smaller 22-story building. (Of the 870 buildings affected by Local Law No. 5, 67% were under 22 stories and only 10% were over 39 stories.) While persuasive, neither test, however, would be dispositive of the constitutionality of Local Law No. 5. As the Supreme Court has stated: "To make scientific precision a criterion of constitutional power would be * * * wholly beyond the protection which the general clause of the Fourteenth Amendment was intended to secure." *(Sproles v Binford,* 286 US 374, 388.)

Virtually every argument urged by plaintiffs was raised in *Oriental* (27 NY2d 212, *supra),* in a challenge to the power of the city to control the emission of pollutants by regulating the use of fuel burners and refuse incinerators. As here, the plaintiffs in *Oriental* claimed that it was impossible to comply with the local ordinance in the time schedule provided, that

the upgrading of equipment was disproportionately costly, that certain provisions for the sealing of incinerators and fuel burners would have a confiscatory impact and that the beneficial effect of the ordinance "would be either nonexistent or so minimal as not to justify the extraordinary expense imposed on property owners" (p 218). The court rejected these arguments, stating (p 219): "This is not to say that there are not serious questions raised as to the wisdom and the practicality of the undoubtedly rigorous measures required by the ordinance. But the ultimate conclusion must be that these are questions within the domain of legislative and executive discretion because they involve choices among alternative reasonable courses of action based on the presently limited knowledge of the extent of the pollution evil and methods of cure. So long as there is reasonable basis in available information, and rationality in chosen courses of conduct to alleviate an accepted evil, there is no constitutional infirmity [citing cases]. It is in this context that some may accord respect to arguments made by appellants to the effect that the city in a panic has adopted measures which will not achieve what is hoped or, if so, at a greater cost then necessary. Yet, the rebuttal is that such arguments, however cogent they may appear to be, do not affect the constitutionality of the ordinance. Efforts at solution of serious problems will not wait on perfect knowledge or the application of optimal methods of alleviation to the exclusion of trial and error experimentation."

In any consideration of the constitutionality of Local Law No. 5, it is important to note that variances from Local Law No. 5's performance standards were available, whenever necessary. Subdivision 6 of section 666 of the New York City Charter empowers the Board of Standards and Appeals to modify or revise any order or determination of the Fire or Building Commissioner. In passing upon appeals subdivision 7 empowers the board to: "vary or modify any rule or regulation or the provisions of any law relating to the construction, use, structural changes, equipment, alteration or removal of buildings or structures, or vaults in sidewalks appurtenant thereto, where there are practical difficulties or unnecessary hardship in the way of carrying out the strict letter of the law, so that the spirit of the law shall be observed, public safety secured, and substantial justice done". Section 668e-1.0 of the Administrative Code provides for judicial review of any board decision

rendered after "appeal or review had under section six hundred and sixty-six of the charter." As already noted, Trial Term held that the requirement for the installation of alarm-communication systems was "void and unenforceable in that the time for production and installation of such systems set forth in the law is inadequate." But alarm-communication systems manufactured by Codata Corp. and seven other makers had been approved by the board in 1973. In fact Codata Corp. had built up its capacity to 200 such systems per year before halting production allegedly due to the instant litigation. Extensions of time were readily available whenever necessary for good-faith compliance with the law. Even if the Building or Fire Commissioner unreasonably denied any extension, the board was fully empowered to grant an enlargement. Where a Board of Standards and Appeals is authorized by law to modify statutory provisions whenever practical difficulty or unnecessary hardship might otherwise result in an unconstitutional deprivation or denial of due process, invalidation of the statutory provisions prior to application for and denial of such relief would be premature. "There has been no * * * deprivation until there has been application for a permit and unreasonable refusal, and a statute does not violate the Constitution where it does not deprive an owner unreasonably of his property if the statute is properly administered in accordance with its terms." *(People v Calvar Corp.,* 286 NY 419, 421; see *Dowsey v Village of Kensington,* 257 NY 221; see *Matter of Brous v Smith,* 304 NY 164, 170, 171; see, also, *People ex rel. Sheldon v Board of Appeals,* 234 NY 484, 493-495.) Statutes will not be struck down unless the plaintiffs are actually aggrieved. *(Oriental Blvd. Corp. v Heller,* 27 NY2d 212, 220, *supra; Headley v City of Rochester,* 272 NY 197, 205-206.)

Holding, as we do, that Local Law No. 5 is constitutional, we further find that promulgation of rules by the Fire Commissioner to carry out the basic purpose of Local Law No. 5 was a valid exercise of his powers. There rules, known as fire drill and evacuation rules, would utilize building personnel and create the positions of fire warden and deputy fire warden, positions to be filled by employees of tenants in the buildings. Trial Term found that without a showing of legislative intent to permit the Fire Commissioner to "mandate the conscription of private citizens as fire wardens and deputy fire wardens" he lacked the authority to legislate. While Local

Law No. 5 does not specify the creation of the position of fire warden, it does require a fire safety plan in which "[a]ll occupants of the building shall participate and cooperate" (Administrative Code, § C19-161.2; Local Law No. 5, § 1). The law also requires the utilization of two-way voice communications from a fire command station in the lobby "to the warden on each floor of the building" (Administrative Code, § C26-1704.5, subd [h]; Local Law No. 5, § 25); the installation of equipment at "a designated floor warden station on each floor" (Administrative Code, § C26-1704.8; Local Law No. 5, § 30), and the location of a floor warden station on each floor between required stairways (Administrative Code, RS 17-3A, subd 7; Local Law No. 5, § 39). The creation of the position of fire warden and deputy fire warden was a logical extension and implementation of the legislative intent of these sections.

■ We take this occasion to note that it was improper to grant class action status in the McCallin suit. "[W]here governmental operations are involved, and where subsequent petitioners will be adequately protected under the principles of *stare decisis* * * * class action relief is not necessary." *(Matter of Jones v Berman,* 37 NY2d 42, 57; see, also, *Matter of Martin v Lavine,* 39 NY2d 72, 75.) Moreover, when class action is sought to invalidate a legislative exercise because compliance costs would constitute a confiscation of private property, the impropriety of class action status, even by ordinary class action standards, becomes apparent. Each real estate owner and each parcel of property subject to Local Law No. 5 are affected to a different degree. Compliance and time requirements, as well as the expenses to be incurred, vary for each building. Most importantly, each owner is entitled to seek an extension and/or variance or modification from the Board of Standards and Appeals (New York City Charter, § 666, subds 6, 7). The appropriate remedy for those aggrieved by Local Law No. 5, proceeding here as a class, is to apply individually to the Board of Standards and Appeals. Any adverse ruling from the board could then be reviewed in an article 78 proceeding.

■ Our system of separation of powers endows the Legislature with the prerogative to legislate. The judiciary may review any exercise of that prerogative for its constitutionality, but not for its wisdom. We observe that the danger factors which compelled enactment of Local Law No. 5 are as valid today as they were at the time of the passage of the law.

Although Local Law No. 5 is not a perfect statute, and perhaps not even a particularly good statute, we must not lose sight of the city's obligation to protect the 2,000,000 workers who spend a significant portion of their daily lives in high-rise buildings. Any defects and inequities inherent in Local Law No. 5 are matters not for the judicial arm of government, but for the Legislature. Trial Term's substitution of its judgment for the Legislature's cannot be sustained.

Accordingly, the judgments of the Supreme Court, New York County (KIRSCHENBAUM, J.), entered June 19, 1977, should be modified, on the law, without costs or disbursements, to the extent of denying class action status in the McCallin suit, declaring all sections of Local Law No. 5 and the fire department's fire drill and evacuation rules valid and enforceable on their face, vacating the permanent injunctions, and, except as thus modified, affirmed.

MURPHY, P. J. (dissenting in part). I do not challenge the wisdom of this legislation nor the need for it. *(Queenside Hills Co. v Saxl,* 328 US 80, 82.) Likewise, I agree with the majority that, with one exception (smoke venting), the outlays mandated by Local Law No. 5 are not disproportionate to the owners' capital investment or the benefits to be obtained *(Oriental Blvd. Co. v Heller,* 27 NY2d 212, 221). However, for the specific reasons stated below, I find that the smoke venting and the stairway pressurization provisions are unconstitutional, and thus, unenforceable. I also agree with the trial court that Local Law No. 5 does not require owners to sprinklerize their buildings.

Section 7 of Local Law No. 5 provides for the installation of smoke shafts in existing buildings as an alternative method of smoke control. The experts for both sides agreed, as the majority now notes, that the installation of these shafts is economically unfeasible in existing buildings and its use, if any, must be relegated to new buildings. Since it is impossible for the building owners to comply with this provision as now drafted, it must be declared invalid. *(Oriental Blvd. Co. v Heller, supra,* p 220.)

Stairway pressurization is another method of smoke control provided by section 7 of Local Law No. 5. To the extent here relevant, section 7 reads as follows: "Such pressurization shall be provided by means of a system or systems as provided in reference standard RS 5-18 except that the [Building] commissioner shall, after consultation with the fire commissioner and

other appropriate city agencies, but not later than eighteen months from the effective date of this local law [i.e., no later than Aug. 7, 1974], submit to the city council an amendment of reference standard RS 5-18. Such amendment shall reflect the latest technological data and conclusions obtainable from tests of pressurization systems." Local Law No. 26 (1975) extended the Building Commissioner's time to submit the subject amendment to RS 5-18 until February 7, 1976; the compliance date for building owners was thereby extended to August 7, 1977. While there is some indication that a proposed amendment was submitted to the City Council in January of 1976, there is no indication that the City Council ever acted upon it.

From the date Local Law No. 5 was passed, owners doubted the validity and efficacy of the performance standards embodied in the original RS 5-18. They were fearful that the installation of stairway pressurization might result in the highly dangerous conditions of overpressurization or underpressurization. The owners' hesitancy to proceed with the pressurization technique became even more justified when the Building and Fire Commissioners sought an extension of time to submit such amendment. From the evidence adduced at trial, it is fair to conclude that the commissioners had difficulties in formulating new performance standards. Under these circumstances, the pressurization alternative is unreasonable and unenforceable since it requires owners to expend substantial sums of money without legislative assurance that the planned renovation will be structurally sound and effective in a fire emergency. (See *City of Buffalo v New York Cent. R. R. Co.,* 125 Misc 801, 804, affd 218 App Div 810, affd 271 NY 658.)

Section 7 of Local Law No. 5 also provides: "Existing buildings that are sprinklered throughout shall be *exempt* from the smoke shaft and stair pressurization requirements." (Emphasis supplied.) Where the language of a statute is plain and unambiguous and conveys a clear and definite meaning, there is no occasion for resorting to the rules of statutory interpretation, and a court is required, under ordinary rules of construction, to give effect to its plain meaning. The court must take clear, simple, and unambiguous words of the Legislature as it finds them. (56 NY Jur, Statutes, § 114.) In *Baum v Long Is. R. R. Co.* (58 Misc 34, 43), the word "exempt" was defined as follows: "Webster defines 'exempt' to mean: To free; to clear; to be not liable; to be not subject to; to be free; to be

released from some liability which others are subject to: to grant immunity to; to free from obligation; to release."

In the context of this legislation, the word "exempt" would appear to have a very ordinary connotation, i.e., free from obligation. *(Baum v Long Is. R. R. Co., supra.)* It is clear that the City Council intended that if owners voluntarily chose to sprinklerize their buildings, it would be unnecessary for them to comply with the smoke shaft and stairway pressurization provisions. Had the City Council wished to require building owners to sprinklerize their buildings, the word "exempt" would not have been used and section 7 would have been drafted with sprinklerization listed as a third, distinct smoke control alternative. The majority, in effect, redraft Local Law No. 5 by giving the word "exempt" an antithetical meaning.

For the reasons stated in the majority opinion, I would agree that the Fire Commissioner was authorized to create the positions of fire warden and deputy fire warden in the fire drill and evacuation rules. Likewise, I would join with the majority in finding that class action status was erroneously given in the McCallin suit. In passing, I must also stress that the evidence indicated that the compartmentation provision under section 6 was economically feasible and that no valid reason was otherwise presented to void its enforcement.

At trial, conflicting proof was presented as to whether the owners were given sufficient time to buy and install the communication-alarm system (Local Law No. 5, §§ 25, 30). The owners claimed, *inter alia,* that the Board of Standards and Appeals was slow in approving designs and that the few manufacturing companies in the field were untested and not ready for production capacity. While there may be some truth to the owners' allegations in this regard, it would seem that the owners, with a few isolated exceptions, did not proceed with diligence in attempting to comply with this provision during the statutory grace period. In the absence of any orders for the communication-alarm system, this industry never evolved. The evidence indicated that this system, as contrasted with the stairway pressurization alternative, presented a recognizable and attainable goal had the owners pursued it with perseverance.

As the majority aptly observes, Local Law No. 5 is not a perfect statute. While it has the most praiseworthy aim of providing increased fire protection for New York City office workers, many of its provisions were hastily conceived, care-

lessly formulated without proper testing, and inartistically drafted. Because legislation in the fire safety area is of primary importance, there is a natural tendency to minimize, downplay and overlook patent errors in Local Law No. 5, significant as those errors might be. Nonetheless, the citizenry of New York City will best be protected in the long run by redrafted provisions that intelligently channel the vast capital outlays involved into scientifically sound and effective programs.

Accordingly, I would modify the judgments appealed from by vacating so much thereof as (1) declared the compartmentation and communication-alarm provisions to be unenforceable, (2) declared the portion of the fire drill and evacuation rules relating to the appointment of fire wardens and deputy fire wardens to be void, and (3) granted class action status in the McCallin suit, and by (1) declaring the compartmentation and communication-alarm provisions to be enforceable, (2) declaring the rules relating to the appointment of fire wardens and deputy fire wardens to be valid, and (3) denying class action status in the McCallin suit. As modified, I would otherwise affirm the judgments.

SILVERMAN and FEIN, JJ., concur with SULLIVAN, J.; MURPHY, P. J., and LUPIANO, J., dissent, in part, in an opinion by MURPHY, P. J.

Judgments, Supreme Court, New York County, each entered June 29, 1977, modified, on the law, to the extent of denying class action status in the McCallin suit, declaring all sections of Local Law No. 5 and the fire department's fire drill and evacuation rules valid and enforceable on their face, and vacating the permanent injunctions, and, except as thus modified, affirmed, without costs and without disbursements.