OPINION OF THE COURT
Jones, J.
Order reversed, with $10 costs, and matter remanded to the Civil Court for the appointment of an administrator in accordance with RPAPL article 7-A and for all further proceedings.
The Department of Housing and Preservation Development of the City of New York (HPD) commenced these proceedings on March 12,1982, for the appointment of an administrator, to cure and correct 837 housing code violations in a residential dwelling located a short distance from the famous Brooklyn landmark, Grand Army Plaza, that rendered the premises dangerous to the life, health and safety of the tenants and their families. The area, near Prospect Park and the Brooklyn Museum is in the *646 process of gentrification.[1] Modest, low-rent apartments are being converted to high-rent, luxury accommodations.
THE RECENT HISTORY OF 115 EASTERN PARKWAY:
For many years this residential building was controlled by Irwin Weintraub (a principal of Goodwine Realty Corp.), who allowed the structure to deteriorate. In 1981, the property was sold to St. Thomas Equities Corp. Vaneo Equities, Inc., a real estate management firm, obtained the right to purchase the building from St. Thomas Equities Corp. and assigned the contract to Vanway Overland Express, Inc. (Vanway). On February 5, 1982, Vanway executed a contract to purchase the property, and hired engineers to prepare plans to renovate the premises by removing the tenants, demolishing the interior and renovating the structure, to create fewer, but larger “luxury apartments.” Vanway claimed that the New York City Community Preservation Corporation had[2] agreed to make a loan in the *647 sum of $1.2 million to finance its reconstruction of the building. Vanway’s attorney, Charles Simpson, affirmed to this court that a loan application had been approved by the New York City Community Preservation Corporation for this purpose. The President of the New York City Community Preservation Corporation, Michael D. Luppin, by letter dated February 13, 1985 stated that no loan commitment was ever applied for or issued to rehabilitate 115 Eastern Parkway. HPD’s attorney, L. R. Epstein, in a letter dated February 4, 1985, stated that Vanway never applied to the New York City Community Preservation Corporation for a construction loan. Vanway took title to the building from St. Thomas Equities Corporation on April 30, 1982, for a purchase price of $350,000. Goodwine Realty simultaneously became the holder of a $100,000 second mortgage in the premises, which it later assigned to Santa Fe Oil Resources, Inc., on May 1, 1982.
HPD commenced this article 7-A proceeding in the Housing Part of the Civil Court of the City of New York on March 17, 1982, based on the 837 recorded housing code violations, set forth in a computerized list, which included an “inoperable boiler, no running water and an inoperable elevator” and which had created conditions that were “dangerous to the life, health and safety of the tenants residing in 115 Eastern Parkway.” On March 31, 1982, the return date of the article 7-A proceeding, Vanway was permitted to participate, as a respondent. (Throughout the subsequent litigation, Vanway was the only named respondent to appear or answer.) After several adjournments, a trial was held in the Housing Part of the Civil Court of the City of New York, on May 6,1982. In its decision dated May 10, 1982, the court granted HPD’s petition and appointed Eleanor Balthazar, a tenant, as administrator, for the purpose of receiving rents and applying the proceeds to correct the violations. A judgment to this effect was signed on May 24, 1982. In the meantime, on May 21,1982, Vanway obtained a temporary stay of the determination of May 10,1982, pending appeal to the Appellate Term. The Appellate Term denied Vanway’s motion on June 23, 1982. On July 16, 1982, Vanway obtained another order to show cause in the Appellate Term containing a new temporary stay pending appeal of the judgment of May 24,1982. The Appellate Term dismissed this proceeding on August 4, 1982. Undismayed, Vanway moved again, by order to show cause, on August 10, 1982, to stay the administrator from performing her duties, on the grounds that the corporation would make the necessary repairs, correct the 837 violations *648 and render the building habitable. The court accepted Vanway’s promise, and granted its motion on September 8, 1982, on the express conditions that: (1) the specified repairs (heat and hot water) be completed within 30 days; (2) the sum of $30,000 be posted with the clerk of the court to guarantee completion of the repairs, and that (3) the money be forfeited in the event the repairs were not completed. Vanway deposited the money in court on September 8, 1982. Between September 13 and 27, 1982, however, Vanway’s employees removed the oil burner, cut out the boiler tubes, and bricked up the rear passageway of the building. On October 28, 1982, Vanway filed a petition in bankruptcy. On Vanway’s ex parte petition, the Bankruptcy Court stayed all proceedings in the Civil Court. Vanway then filed a petition to evict the remaining tenants. The Bankruptcy Court ultimately denied the application to remove the tenants, on February 15, 1983, and vacated its stay of the Civil Court proceedings. HPD then moved to vacate the order, in Vanway’s favor, dated September 8, 1982, and thereby empower the administrator to resume operation and control of the building, on the ground that Vanway had deliberately failed to comply with the terms of that order. On February 28, 1983, it was determined that Vanway had forfeited the $30,000 deposit to the administrator, who was thereupon authorized to use the fund for repairs. In this decision, the court found, inter alla, that: “the owner and others involved in the management of the building maliciously and vindictively withheld essential services, including heat and hot water from the residents of 115 Eastern Parkway for the entire 1982-1983 heating season to date, in a calculated and still continuing effort to force the residents from their homes.”
The court also stated that: “The owner simply walked away from the building after removing the boiler.”
On March 11, 1983 Vanway obtained another order to show cause in the Bankruptcy Court, staying the administrator from collecting rents, thereby preventing her from proceeding to remove the violations in order to restore essential services. On March 25,1983, the Bankruptcy Court denied Vanway’s motion and vacated this stay. Thirteen days later, Vanway obtained another ex parte stay in the Appellate Term of the Supreme Court against the administrator, pending the appeal of the February 28, 1983 order. On May 5, 1983, the Appellate Term denied Vanway’s application and vacated this latest ex parte stay.
On May 27, 1983, Vanway again moved, by order to show cause, in the Housing Court, to dismiss the article 7-A proceed *649 ing and to surcharge the administrator. On June 7, 1983, the court directed that the article 7-A administrator bring nonpayment proceedings, against the tenants, by employing an attorney, to be designated and paid for by Vanway. On June 13,1983, the court removed the administrator, when she declined to sign the petition to commence nonpayment proceedings for rent. Vanway Corporation thereupon instituted nonpayment proceedings against the tenants. On July 20,21 and August 8,1983, the trial court held hearings on the nonpayment proceedings and on Vanway’s motion to dismiss the article 7-A proceeding. In an oral decision on August 8, 1983, in the nonpayment cases, the court denied Vanway’s motion to dismiss the article 7-A proceeding, on condition that the tenants submit a plan for obtaining sufficient money to enable the administrator to adequately operate the building. On November 4, 1983, the remaining tenants, now reduced to nine families represented by the Legal Aid Society moved for the appointment of an article 7-A administrator and presented a plan to rehabilitate the building. On the same day Vanway obtained another order to show cause, seeking dismissal of the article 7-A proceedings, the vacatur of the premises and sanctions against HPD. These motions were consolidated and presented to the court. On November 30,1983, the trial court dismissed the article 7-A proceedings, and enjoined HPD and the tenants from commencing any proceeding to enforce the Housing and Building Code against the landlord for a period of one year. In an oral decision the court declared that “the economics of the building and the conditions present thereat render the building economically non-viable and the appointment of an administrator would be a futile gesture.”
The trial court’s declaration has placed the remaining, long-suffering tenants in a legal “no man’s land”, without redress or relief. Vanway has deliberately refused to remove the Housing Code violations or provide essential services, in order to drive these tenants out. They have also been effectively deprived of the right to the assistance of an article 7-A administrator, to receive their rents and manage the building properly. This tragic situation exemplifies the methods used by some landlords to frustrate the court’s efforts to render practical assistance to tenants in distress as set forth in the case of Swallow v Schnipper (NYLJ, Sept. 21, 1984, p 14, col 4 [App Term, 2d & 11th Dists]), wherein it was stated that: “To discharge the Administrator, there should be at least a prima facie showing that the reason for the appointment no longer exists. In other words, the movant would have to demonstrate to the trial court that repairs have been made or essential services provided and that there is *650 a plan for the continued maintenance of the building. In the absence of such a showing, a court would be remiss in granting a motion seeking the discharge of the Administrator since ‘a grant of the relief requested would place the property in a state of abandonment to the great detriment of the tenants’ ”.
The trial court’s finding that the building is “in a state of abandonment,” has left the tenants in deep distress and danger, without heat and hot water for 18 months. The legislative purpose in enacting RPAPL article 7-A, viz., “to compel the correction of such conditions” which endanger the life, health and safety of the occupants of multiple dwellings (L 1965, ch 909, § 1) has been defeated until now.
The law of New York State is clear that: A “landlord is vested with the ultimate control and responsibility for the building, it is he who has [the] corresponding * * * and nonwaivable duty to maintain it” Park W. Mgt. Corp. v Mitchell, 47 NY2d 316, 327 [1979]). The so-called “economic viability” of a building may not be used as a device, nor raised as a standard by which a landlord is permitted to escape his “nonwaivable duty.” In my view the trial court’s determination — that 115 Eastern Parkway is “economically non-viable” — is against the weight of the evidence, in the light of HPD’s commitment to install a new heating system, as soon as an administrator is appointed and in view of the fact that $61,000 is presently available ($30,000 forfeiture of Vanway’s deposit; $17,000 which could be achieved from an article 7-A financial assistance loan; $14,000 in rent on deposit with the court below), for repairs to the building, along with the presentation of a plan by the tenants to gradually restore the building to full rental status.
Vanway’s reliance on McGovern v 310 Riverside Corp. (49 AD2d 949 [2d Dept 1975]), in regard to the “non-economic viability of a building” as a ground for the discharge of an article 7-A administrator, is not apposite. In McGovern, the court said: “In our opinion, the record of appeal amply supports the decision of the trial court that the condition of the building was so dangerous to the life, health and safety of the tenants as to render the building uninhabitable and that the appointment of an administrator in the proceeding would be a futile gesture, because such administrator would not be able to raise sufficient income to properly repair and maintain the premises.” (Emphasis supplied.)
The McGovern case (supra) is distinguishable from this case on two grounds. In the first place, HPD has made a commitment to install a “complete new heating system including all neces *651 sary draining and pipes, and $61,000 is available to be used by the Administrator to further renovate and rerent the apartments in the building. Secondly, we note that, as opposed to the facts presented in McGovern, the. Housing Court has found that: “The owner and others involved in the management of the building maliciously and vindictively withheld essential services, including heat and hot water from the residents of 115 Eastern Parkway for the entire year 1982-1983 heating season, to date, in a calculated and still continuing effort to force and residents from their homes.”
A basic precept of our moral order and a cardinal principal of American law’ is that our courts will not allow a wrongdoer to profit from his own illegal conduct. Equity requires that a party seeking relief in our courts must come with “clean hands.” The landlord, Vanway, has wronged the tenants by depriving them of heat and hot water for almost two years. Moreover, Vanway’s attorney appears to have misled this court, and perhaps the courts below, by affirming that a $1.2 million reconstruction loan had been approved by the New York City Community Preservation Corp. Vanway has persistently exhibited a calculated contempt for law and justice and the rights of the tenants who remain in residence at 115 Eastern Parkway. The findings of the court below that the building is not economically viable is found to be against the weight of the evidence. HPD has made a prima facie showing that there will be sufficient funds available, and income forthcoming, to “properly repair and maintain the premises” (see, McGovern v 310 Riverside Corp., 49 AD2d 949, supra). HPD is also under a legal obligation to ensure that the public funds it commits to rehabilitate the heating and other systems in the building are properly used for the benefit of the tenants. The New York City Charter § 1802 (7) (1) requires HPD to: “supervise the execution and management of all programs, activities and expenditures of the department”.
Moreover, the Administrative Code of the City of New York § 93c-7.0 requires that city officials, who disburse public moneys, furnish reports to the comptroller and maintain a statistical record system of all expenditures.
I pass on no other question.
Kunzeman, J., concurs in a separate memorandum; Buschmann, J. P., taking no part.
Kunzeman, J., concurs and votes to reverse the order of the court below and remand the matter for the appointment of an RPAPL article 7-A administrator and all further proceedings in the following memorandum:
*652 It is my view that the determination of the court below constituted an improvident exercise of discretion in light of the commitment by the petitioner to install a new heating system as soon as an article 7-A administrator is appointed, together with the fact that approximately $61,000 is available for repairs to the building, supported by the plan prepared by the tenants to repair and restore the building in its entirety.
I have not considered any other issue.

. Gentrification was defined in Business Assn, of Univ. City v Landrieu (660 F2d 867, 874, n 8 [3d Cir 1981]): “Gentrification is a term used in land development to describe a trend whereby previously ‘underdeveloped’ areas become ‘revitalized’ as persons of relative affluence invest in homes and begin to ‘upgrade’ the neighborhood economically. This process often causes the eviction of the less affluent residents who can no longer afford the increasingly expensive housing in their neighborhood. Gentrification is a deceptive term which masks the dire consequences that ‘upgrading’ of neighborhoods causes when the neighborhood becomes too expensive for either rental or purchase by the less affluent residents who bear the brunt of the change.”
In an article Gentrification, Tipping and National Policy (11 NYU Rev L & Soc Change 255, 261-262 [1982-1983]), speaking of the issue of gentrification as an “Integrating or Segregating Force”, stated:
“Studies of the middle-class entrants in inner city neighborhoods show that they are overwhelmingly white and college educated, and predominantly young, middle-income professionals with no children. Since the new arrivals are homogeneous, an integrated neighborhood can be maintained only if some original residents stay.
“In fact, both market forces and political behavior tend to drive out former residents and make gentrified neighborhoods homogeneous by race and class. Since [housing] consumers expect neighborhood homogeneity, when some middle class pioneers move in, others follow in anticipation of the neighborhood’s eventual transition up to middle class. As affluent housing consumers (who tend to be white) decide to move in, the local real estate market heats up and a rush of speculative buying raises property values and rents. The poor (who tend to be black) are soon faced with unaffordable rents, taxes and purchase prices which force them to move out of the neighborhood.”

. The Community Preservation Corporation is an entity created and funded by major banks in New York City (Chemical Bank, Citibank, N. A., Manufacturers Hanover Trust Co., Metropolitan Savings Bank, Morgan Guaranty Trust, etc.) in an effort to cure the adverse effects of “red-lining” in certain geographic neighborhoods. CPC makes rehabilitation loans available at low interest rates in areas in which the individual banks would either not *647 make the loan or the interest rates and amortization on such a loan could not be serviced by the income generated by the building.