OPINION OF THE COURT
Ira R. Globerman, J.
An apartment building wall has collapsed and the building vacated. The defendant Erin Construction Corporation, charged with building code violations said to be related to the collapse, appears before the court for sentence on a plea of guilty to the violations. The New York City Corporation Counsel, the prosecutor, has moved to sentence the defendant under the provisions of Penal Law § 80.10 (2) (b) which authorizes a fine in the amount of twice the gain realized as a result of the unlawful conduct. Defendant has cross-moved to withdraw the guilty plea entered on its behalf and asserts as well that it has done all that may be required of it and everything within its power to comply with the law and, accordingly, should be fined, if at all, a minimal amount.
PROCEDURAL HISTORY
On July 18, 1985, Mr. Pat McEvoy was served with three appearance tickets, each charging a violation of the Administrative Code of the City of New York in the buildings 215 or 217 East 3rd Street, Manhattan. The buildings are owned by the limited partnership McChip Associates of which McEvoy is the general partner. On August 22, 1985, the return date for the appearance tickets, informations were filed in each case. On the 22nd, the calendar call was answered by Mr. Winston Barrow, a general contractor by profession and a vice-president of Erin Construction Corporation, an entity whose sole principals were McEvoy and Barrow. Erin Construction was the contractor hired by McChip Associates to work on 215 and 217. Barrow, after conferencing the case with an Assistant Corporation Counsel, advised the presiding Criminal Court Judge that Erin Construction Corporation wished to be substituted for the named defendant and have guilty pleas entered on its behalf. After Barrow reported to the court that any hazardous conditions had been corrected by shoring and bracing the buildings, guilty pleas were entered on behalf of the corporation. The prosecutor consented.
On docket No. 5N323384/V the plea was entered to the violation of section C26-105.1 of the New York City Administrative Code in satisfaction of an information charging the *809 defendant with a failure to maintain bulging brickwork at all stories in the east wall of the building at 217. On docket No. 5N323385/V, a similar plea was entered to charges that the defendant failed to maintain a rotted wood header beam over the entrance doors and failed to repair bulging brickwork on the east side above the first story of the building at 215, a condition denoted as hazardous. And on the final matter, No. 5N323386/V, the plea was entered to the same charge, in this instance arising out of the failure to maintain the brickwork and sills on the front facade of 215 from the second through fourth stories. All three cases were then adjourned for sentence, presumably to monitor the correction of the violations which, if accomplished, would have mitigated the sentence to be imposed.
After three adjournments during which nothing substantive was accomplished in court, the matter appeared before me for the first time on March 7, 1986, for sentence to be imposed. The defendant appeared by counsel. I learned that after the plea had been entered and before the matter came before me for sentence, a portion of the front wall of 215 failed and the building had to be vacated. The prosecution alleged that the collapse resulted from the failure to cure the violations and consequently urged that the maximum fine of $15,000, $5,000 for each violation, be assessed. The defense disclaimed responsibility for the failure, its counsel contending that good-faith efforts to cure the violations had been made and, therefore, the fine should be greatly mitigated. Given the gravity of the consequences of the collapse, I advised counsel that a severe sentence was likely if the responsible parties’ action or inaction had contributed to the collapse. Sentencing was adjourned for a hearing to determine the facts.
Two days before the hearing date, the prosecutor notified the defense that it would move pursuant to Penal Law § 80.10 to have the court sentence the defendant to a fine equal to twice the gain the defendant realized as a result of the offenses. On the adjourned date, defendant’s counsel reported that he had not yet received the notice of the People’s motion but that he was prepared nonetheless to proceed with the taking of testimony concerning the nature of the collapse.
After two days of testimony from witnesses presented by both parties, the matter was adjourned for further evidence as to the gain, if any, realized as a result of the offenses. Formal notice, required by CPL 400.30, was waived. Before the taking of testimony was resumed, new counsel was added for the *810 defense. This attorney advised that the defendant now wished to withdraw its guilty plea and, if such relief were not granted, to reopen the defendant’s case on the sentencing hearing for testimony seeking to establish innocence of the offenses charged and for additional evidence in mitigation of sentence. Leave was granted to reopen the hearing for the defense to present evidence in support of its newly raised contention that curing the violations was not economically feasible and that, consequently, the responsible parties had done all that could be lawfully required to cure the violations.
MOTION TO WITHDRAW THE PLEA
An individual defendant has the right to counsel at every significant stage of the prosecution, including arraignment and the tendering of a guilty plea (CPL 170.10). A defendant may, however, waive this right, and such waiver will be effective if it is " 'made with an apprehension of the nature of the charges * * * [Under ordinary circumstances a] judge can make certain that an accused’s professed waiver of counsel is understandingly and wisely made only from a penetrating and comprehensive examination of all of the circumstances under which such a plea is tendered’ ” (People v Seaton, 19 NY2d 404, 406 [1967], citing Von Moltke v Gillies, 332 US 708 [1948]).
These principles, however, have no application where, as in the instant case, the defendant is a corporation. CPL 170.10, which sets forth the rights of a defendant arraigned on a criminal court instrument, expressly provides at subdivision (8) that "[n]othing contained in this section applies to the arraignment of corporate defendants, which is governed generally by the provisions of article six hundred.” Thus, corporate defendants are specifically exempted "from the arraignment instruction requirements and there are no explicit or implicit obligations placed upon a court to instruct a corporate defendant as to its rights either generally or particularly” (Bellacosa, Practice Commentary, McKinney’s Cons Laws of NY, Book 11 A, CPL 600.20, at 255; People v Flushing Hosp. & Med. Center, 122 Misc 2d 260 [Crim Ct, Queens County 1983] [hospital corporation in pleading guilty to hearsay complaint waived prosecution by information notwithstanding the absence of an effective admonition of the right to be prosecuted by information]).
CPL 600.20, dealing with the prosecution of corporate defen *811 dants, provides that "At all stages of a criminal action, from the commencement thereof through sentence, a corporate defendant must appear by counsel. Upon failure of appearance at the time such defendant is required to enter a plea to the accusatory instrument, the court may enter a plea of guilty and impose sentence.” Thus, the CPL actually imposes on the corporate defendant the affirmative obligation to appear in court by counsel (also see, CPL 340.20 [3]; 220.50 [2], requiring pleas to informations and indictments against corporations to be entered by counsel). Accordingly, a default judgment may be entered against a corporation that fails to appear through counsel (CPL 600.20; People v Flushing Hosp. & Med. Center, supra, at 273).
In the instant case, Erin Construction Corporation acted to substitute itself for the originally charged individual defendant, acted to appear at the arraignment without counsel notwithstanding the requirements of CPL 600.20, and acted to have a guilty plea entered on its behalf. There is no claim that the corporation’s actions were unlawful or unauthorized, nor is there any request to withdraw the substitution. Since the arraignment court was authorized to have entered a guilty plea and impose sentence when the newly substituted corporate defendant failed to appear in accordance with CPL 600.20, the court’s compliance with the defendant’s wishes in entering the guilty plea absent an appearance by counsel need not be reversed.[1]
The defendant’s failure to appear by counsel was knowing and willful. The defendant was in contact with its attorney *812 about related landlord-tenant cases involving 215 which were pending at the time of the allegedly uncounseled plea. The very same attorney who appeared for the defendant on the criminal cases on March 7, 1986, appeared as counsel in the civil cases prior to the entry of the guilty plea.
The defendant was uncounseled only inasmuch as counsel was not physically present in the courtroom at arraignment. Moreover, unlike the defendant in People v Seaton (19 NY2d 404, supra), an apparent first-time offender charged with endangering her children whose waiver of the right to counsel was deemed ineffective, defendant in this case is "[no] stranger to court proceedings. He continually appears before this court on a variety of construction matters”. Corporation Counsel’s assertion of Barrow’s knowledgeability was uncontradicted by defendant and was, in fact, corroborated by Barrow who stated that he appeared "without benefit of counsel” because he "believed that the consequences of a guilty plea would have been the usual moderate fine, i.e., less than $1,000.” Evidently, Barrow and McEvoy did not consider a criminal case that was likely to entail only "the usual moderate fine” sufficiently important to justify the attorney’s in-court assistance. Accordingly, it is fair to assume that although defendant did not appear "through counsel” at the arraignment, this was a conscious decision and that Barrow’s conduct was in no real sense "uncounseled”.
A corporation that has disregarded the requirement of CPL 600.20 that it appear through counsel may not benefit from its noncompliance. The fact that an individual was the original named defendant did not relieve Erin Construction Corporation of the responsibility of appearing with an attorney since the corporation wanted and expected a substitution to take place. The motion to withdraw the plea on the ground that counsel was not present when it was entered is denied.
The disparate treatment of corporate and individual defendants as regards guilty pleas may be explained by the fact that corporations are not subject to the loss of liberty or stigma of a criminal conviction. (See, Penal Law § 60.25; People v B.N.B. Realty Corp., 85 Misc 2d 487, 489 [Dutchess County Ct 1976] [Public Defender whose authorization to represent indigents extends only to cases where defendant is subject to imprisonment may not represent corporate defendant].)
This consideration is most significant in evaluating defen *813 dant’s contention that the plea must be set aside because it did not represent a bargain, i.e., the defendant received nothing by way of a sentence promise in return for its plea of guilty. This contention ignores the significance of the corporate substitution and misapprehends the legal consequences of the plea’s acceptance. The plea was offered, not by the party named in the information, but by a corporation whose substitution was required as a condition to the entry of the plea. The plea’s acceptance relieved McEvoy, one of the corporate defendant’s two officers, of any personal liability in the matter, removed his name from the record, and limited any sanction that might be imposed to a fine. The value to McEvoy of the plea and substitution appears to have been substantial.
The motion is also denied because the defendant has waited a full 10 months after entry of the guilty plea, long after counsel appeared to litigate the sentence, to bring its motion. While the motion is timely in terms of CPL 220.60, defendant has failed to state a substantial reason for the delay (People v Bradshaw, 164 Misc 565, appeal dismissed 253 App Div 405 [3d Dept 1938]), despite the fact that counsel appeared for the defendant a number of times before this application was made. Even though counsel was not present for the defendant on the date the plea was entered, defendant appeared by counsel at least as early as March 7, 1986 for the sentencing hearings. Although additional counsel appeared for the defendant in April 1986, he did not replace the first attorney but entered the case "of counsel”. No explanation is even offered for delaying the motion to withdraw the plea for several months after two days of testimony on the sentencing hearing had been taken and a full nine months after the plea was entered.
In sum, because the defendant corporation has become dissatisfied with the consequences of its actions, it may not at this late stage of the proceedings assert the rights reserved for individuals while at the same time retaining the protections from personal liability for its principals afforded by corporate status.
Defendant’s other asserted ground for withdrawal of the plea — that it is innocent of the crime charged — is based on its contention that economic hardship relieved it of responsibility for remedying the Buildings Department violations. Defendant’s belated claim of innocence is not viable and provides no basis for granting its motion to vacate the plea.
*814 "In [People v] Serrano, the Court of Appeals held that a guilty plea may not stand where, in the course of the plea colloquy, the defendant makes statements which cast doubt upon his guilt of the crime to which he is pleading.” (People v Moore, 130 AD2d 375, 376 [1st Dept], citing People v Serrano, 15 NY2d 304 [1965]; accord, People v Nixon, 21 NY2d 338 [1967]). A fair reading of these cases demonstrates that to set aside a guilty plea on these grounds, a defendant’s doubt about his guilt must have existed at the time the plea is taken and that his claim of innocence must find expression, however inarticulate, in the language of the plea allocution itself or at the very least be inferable therefrom. This requirement is not met where, as here, defendant failed to evince the slightest doubt as to his guilt at the time of the plea, and, in fact, informed the court — contrary to fact — that "all the work is being done” to remedy the violations.[2]
Furthermore, even if in the course of the plea colloquy defendant had alluded to economic constraints, it is at least problematic as to whether economic hardship constitutes a viable defense to noncompliance with Buildings Department requirements where, as here, the violations stem from landlord neglect. (Department of Hous. Preservation & Dev. v St. Thomas Equities Corp., 128 Misc 2d 645, 650 [App Term, 2d Dept 1985], "The so-called 'economic viability’ of a building may not be used as a device, nor raised as a standard by which a landlord is permitted to escape his 'nonwaivable duty’ [to maintain it]”; but see, People v Carolan, Crim Ct, NY County, May 29, 1986, Bednar, J. [denying motion to dismiss but suggesting that economic hardship might be a defense provable at trial].)
Both cases cited by the defense in support of its claim to a defense of economic hardship are distinguishable from the case at bar. In People v Broadway-Sheridan Arms (275 App Div 352 [1st Dept, 1949], affd 300 NY 559), the Appellate Division reversed the conviction of a landlord who had been found guilty of permitting single-room occupancy in a class A multiple dwelling in violation of law. The court found that the defendant had been willing to terminate the illegal use of the *815 premises caused by illegal subletting but had been impeded by a Municipal Court ruling that possession of the prime tenants was protected by a Federal statute (despite violation of the Multiple Dwelling Law) and that eviction of the prime tenants would effectually accomplish dispossession of the subtenants, thus exceeding the limits of the certificate of eviction issued by the rent commission. The landlord’s appeal of the Municipal Court ruling dismissing the summary proceeding was unsuccessful and the Department of Housing and Buildings instituted a criminal proceeding. In reversing the conviction, the Appellate Division emphasized that the illegal use of the premises was not caused by the landlord, that the landlord had exhausted its legal remedies in an effort to evict the prime tenants in order to terminate the illegal use, and that under the circumstances it would be inequitable to require the landlord to alter the premises so as to legalize the single-room occupancy at a cost in excess of $100,000. Central to the court’s finding that the owner was not obligated to make "extensive and economically improvident alterations as the only alternative to avoid a conviction for violating the law”, was the fact that the landlord was not responsible for any illegal condition resulting from neglect of the premises, but was, in fact, the victim of unlawful acts committed by others (supra, 275 App Div, at 356).
The holding of Broadway-Sheridan Arms (supra) appears limited to its extraordinary facts and cannot be cited as support for the proposition that economic hardship constitutes a defense in a criminal prosecution for the violations of the Administrative Code that are charged here. The case has been cited as appellate authority in a published opinion only once in nearly 38 years and never in a criminal proceeding. Rubin v Hevro Realty Corp. (84 Misc 2d 1074, affd 55 AD2d 536 [1st Dept 1976]), the only case relying on Broadway-Sheridan Arms and the only other case cited by defendant as authority for the existence of an economic hardship defense, was a civil matter in which tenants commenced a class action for various kinds of relief including an order directing the owner to correct and repair hundreds of electrical violations in a building that had been virtually destroyed by fire. There, the landlord’s assertion that the cost of removing the violations would run in excess of $1,250,000 was uncontradicted. The court held (supra, 84 Misc 2d, at 1077) that, accordingly, "it would be confiscatory to compel the expenditure of such an *816 amount in a building which to all intents and purposes might be characterized as a 'white elephant’. ”
Rubin v Hevro Realty Corp. (supra) must, like People v Broadway-Sheridan Arms (supra), be limited to its unique facts. In Rubin (supra, 84 Misc 2d, at 1075-1076) the New York City Department of Public Works had already issued an order to disconnect the electricity in the premises because the "literally hundreds of electrical violations on the premises * * * constitute^] immediate hazards to the life, health and safety of the tenants and to third parties.” Upon discontinuance of electrical service a vacate order would issue automatically from the Buildings Department. The court (supra, at 1077) balanced the inconvenience of relocating the remaining tenants against the grave and immediate danger posed by the violations combined with the prohibitive (and uncontradicted) cost of repair, and not unreasonably, under the circumstances, concluded that an order to make such "extensive and improvident alterations would border on confiscation.”
Recently, in circumstances closer to the instant case, courts specifically charged with enforcement of the Administrative Code have rejected the economic hardship defense (Chan v 60 Eldridge Corp., 129 Misc 2d 787 [Civ Ct, NY County 1985]; Fernandez v Tsoumpas Bros. Co., 126 Misc 2d 430 [Civ Ct, NY County 1984]; but see, Housing & Dev. Admin, v Johan Realty Co., 93 Misc 2d 698 [App Term, 1st Dept 1978]; Rodriguez v Westco Realty Co., 136 Misc 2d 107 [App Term, 1st Dept]).
Even if economic hardship were a defense to the type of violations of the Administrative Code that are the subject of this hearing, defendant in the instant case has failed to allege in his moving papers the evidentiary facts necessary to raise the issue. Nevertheless, at the sentence hearing, the defendant was permitted to offer evidence of economic hardship in mitigation of sentence. The hearing record amply demonstrates that such a defense, if it were to be accepted, cannot be established on the facts of this case.
FINDINGS OF FACT
At the sentencing hearing the prosecution contended that Barrow and McEvoy not only failed to cure the violations during the 1 Vi to 2 years since they had been issued but had also intentionally brought about the failure of the wall at 215 that caused the buildings to be vacated. The prosecution argued that as a consequence, the buildings could be recon *817 structed and the apartments sold as cooperatives or condominiums, thereby creating a far greater profit than could have been gained from maintaining or selling the buildings as rent-regulated multiple dwellings, the status of the buildings when purchased. It is this additional gain that is the object of the Penal Law § 80.10 motion.
Determination of the motion, then, initially requires findings about the condition of the buildings, the feasibility of the required repairs, and the cause of the collapse.
[Factual analysis of hearing testimony omitted for publication.]
In conclusion, the defendant has utterly failed to undermine the prosecutor’s contention that the violations in 215 and 217 could have been cured without vacating the tenants and reconstructing the buildings. The defense has not shown that the violations could not have been cured without expending unreasonable sums of money, whatever that amount might be.[3] Finally, the evidence has shown that McEvoy and Barrow never believed in good faith that the repairs could not be made without reconstruction. Rather, the evidence establishes an attempt by McEvoy and Barrow to use the obligation to cure the violations and the neglected condition of these two buildings as a pretext for the removal of the tenants who resided in them so as to permit reconstruction of the buildings as inexpensively as possible and to permit the marketing of new apartments not subject to rent regulation.
That the buildings would have required extensive repairs could not have come as any surprise to McEvoy since they were old and neglected when purchased. The cost of repairing them must have been apparent from the onset. The generalized need for repairs cannot be used to justify the course of conduct followed by McEvoy and Barrow. On the contrary, the prosecutor has shown by more than a preponderance of the credible evidence that the violations in 215 and 217 could have been cured by localized repairs which would not have necessitated removing the tenants, and which would not have entailed extraordinary expense.
*818 There was conflicting testimony at the hearing about the immediate cause of the collapse in the front wall of 215. The prosecutor contended that the failure was intentionally brought about, perhaps caused in some way by McEvoy or someone working at his direction. I have heard little evidence to support that contention and find that it has not been established. However, I do find that credible evidence substantially supports the conclusion of the tenant’s expert, Richard Balser, that the immediate cause of the wall’s failure was not its age or weakened condition. This conclusion was also reached by Buildings Department Deputy Superintendent Arnold Tamm. I also find that the condition of the 217 wall, the major problem seen in the report of structural engineer Marc Levinn and his testimony, had nothing to do with the collapse.
Significantly, the failure occurred at the very time both buildings were being shored as part of the defendant’s plans for reconstruction. I find by a preponderance of the evidence that the failure of the front wall was brought about by carelessness in wedging the interior shoring that was being erected throughout the buildings. Given the evidence that McEvoy and his workmen were in 217 at the time of the failure, I find it unlikely that someone would intentionally punch a hole in the 215 wall to cause a collapse at that time.
Nonetheless, the collapse of the wall and the vacating of 215 were the direct consequences of Barrow and McEvoy’s obdurate refusal to make the repairs necessary to cure the violations. The failure would not have occurred in a strengthened wall; the shoring was erected only in furtherance of defendant’s plans to vacate and reconstruct the buildings. The decision to permit the violations to go uncorrected was a necessary element in that plan. The insistence on unlawfully reconstructing the buildings while tenants remained in residence, unlawful at least because the authorization to do the work was obtained by misrepresentation, created an opportunity for profit at the expense of the tenants’ safety. The gain was secured when the wall collapsed and the building had to be vacated.
THE SENTENCE
The most severe penal sanction that can be imposed when a corporation is convicted of an offense is a fine. (People v Mature Enters., 35 NY2d 520, 523 [1974]; Hechtman, Practice Commentaries, McKinney’s Cons Laws of NY, Book 39, Penal *819 Law § 80.10, at 278.) The fine may be assessed in an amount authorized by conviction of the particular grade of offense at issue (Penal Law § 80.10 [1]), or in "[a]ny higher amount not exceeding double the amount of the corporation’s gain from the commission of the offense.” (Penal Law § 80.10 [2] [b].) "Gain” is defined as "the amount of money or the value of property derived from the commission of the crime” less certain deductions not applicable to this case (Penal Law § 80.00 [2]; § 80.10 [3]).
Before enactment of the authority to impose fines up to the amount of twice the gain from the criminal conduct, the financial penalties were usually not effective due to the small fines that were authorized by law. (People v Mature Enters., supra, at 526 [Jasen, J., dissenting].) The imposition of so-called standard fines has been criticized for its leniency and inability to serve as a deterrent. (See, e.g., United States v Mitsubishi Intl. Corp., 677 F2d 785, 788 [9th Cir 1982].)
The Legislature has addressed itself to the problem of ineffective fines by authorizing the imposition of substantial monetary penalties against corporate defendants. Such penalties ensure that "crime will not pay” by compelling the defendant to disgorge all ill-gotten gains. Substantial penalties may also serve as a deterrent influence on those similarly inclined (see, Penal Law § 1.05 [6]). Furthermore, the flexibility afforded to a court in setting the fine permits a differentiation between serious and minor offenses (see, Penal Law § 1.05 [4]). And, as this case illustrates, a substantial fine provides an appropriate public response to the consequences of the offense to the community (see, Penal Law § 1.05 [5]). Where, as here, a defendant has realized substantial gain from unlawful conduct, the imposition of a fine based upon that gain and in excess of the ordinary limit is most appropriate.
With regard to the two violations in 215, McEvoy and Barrow’s refusal to take any steps to cure the violations and their insistence that the building be vacated to permit its reconstruction brought about the near disaster of the front wall failure. Whether one believes the collapse to have been the result of an intentional act to destroy the wall or the result of careless construction of the interior shoring, it was most certainly the product of the defendant’s determination not to cure the violations in the hope the tenants would be forced to vacate. The contention that the Levinn report in some way justified defendant’s inaction is incredible. Rather, the report appears to have been another aspect of a calculated *820 effort to empty the building of occupants in order to maximize its profitability.
That the building was aging and in need of repair is not disputed; nor is the fact that McChip Associates had owned this building for only 1 Vi years at the time of the failure. The decision to purchase 215 was made not by novices but by men with 20 years of experience in rehabilitating buildings. The building had been inspected and its condition should have been known to McEvoy. Having willingly assumed the privileges and responsibilities of ownership, it is only just that McEvoy be held accountable. The fact that the required repairs might have proved expensive or difficult is no excuse for dispensing with the enforcement of building codes enacted to protect the safety of tenants and the general public alike.
" 'The mere fact that the law cannot be enforced without causing expense to the citizen who comes within its provisions, furnishes no constitutional obstacle to such enforcement. * * * If such a rule were adopted it would be impossible for the city to enforce any building laws involving the expenditure of money, excepting in times when real estate values were high’ ” (McCallin v Walsh, 64 AD2d 46, 60, affd 46 NY2d 808 [1978], quoting Crockcroft v Mitchell, 187 App Div 189, 194, 203, affd 230 NY 630 [1921]).
The prosecution has argued that the defendant realized an immediate gain when the collapse of 215 required that it be vacated thus making possible the renovation of the entire building. The expert witness called in support of this contention was Roger Darby, a real estate appraiser. I found him to be an entirely credible witness whose opinions were well supported by articulated facts. This testimony was uncontradicted and virtually unimpeached and I accept it as it was given.
Darby concluded that a gain of approximately $170,000 could be realized by vacating and rehabilitating all units in 215 and 217. This finding is based on the difference between the market value of the unimproved properties occupied by tenants and the market value of vacant rehabilitated units, less the cost of acquisition, reconstruction and marketing of the new units. He went on to state that this total figure could be fairly allocable on a per apartment unit basis. In accord with this testimony, dividing $170,000 by the 12 potential apartment units in 215 and 217 yields a realized gain of approximately $14,000 per unit.
*821 In arriving at the number of potential apartment units, Darby considered 217 to be comprised of 4 apartments, the front building at 215 to be comprised of 4 apartments (presently 3 apartments and 1 commercial space that he counted as a potential apartment) and a rear building related to 215 to be comprised of 4 apartments.
The fine I assess will not charge the defendant for any gain realized from the four rear units of 215 since there is no evidence in the record that any tenants lived in the rear building at the time of the collapse and, consequently, no evidence that any tenant had to be vacated as a result of it. Nor will the defendant be charged for any gain realized from the apartment in 217 since the tenants there remained in residence after the collapse.
Since 1 of the 4 units in the front building 215 was a store, it will not be considered as having been "freed” for development as a result of the collapse. The fine, then, is assessed, in part, based on the gain realized by the increased market value of the building attributable to the potential rehabilitation of the three remaining apartments.
FINE IMPOSED
With regard to the failure to cure the violation at 217, I fine the defendant the maximum penalty permitted by section C26-86.5 (a) of the New York City Administrative Code, $5,-000. This fine is warranted by the extraordinary conduct of McEvoy and Barrow in not only willfully refusing to cure the violation, but in seeking to use its existence as a pretext to vacate the building. I have not invoked Penal Law § 80.10 sanctions since the building was still occupied at the time of the hearing and, therefore, the prosecutor has not shown that any gain has been realized as a result of the failure to cure.
As regards the violations at 215, the fine will be assessed in two components. First, given the willful and extraordinary conduct of McEvoy and Barrow in failing to cure these conditions, I assess the defendant with the ordinarily maximum penalty of $10,000, $5,000 for each violation. In addition, so as to prevent the realization of any gain from the collapse brought about by the failure to cure, I augment that component with a sum equal to the gain realized when the wall collapsed and the building had to be vacated. This additional sum is computed by adding $14,000 for each of the three apartment units to be reconstructed, $42,000 in total. It is *822 only because I find insufficient evidence to establish that McEvoy and Barrow intentionally breached the wall at 215 in order to cause the collapse that I have not fined the defendant an amount equal to twice the gain realized.
The fines are imposed as follows: on docket No. 5N323384/V, $5,000; on docket No. 5N323385/V, $26,000; on docket No. 5N323386/V, $26,000.

. Although the corporate substitution is not challenged by the defendant, I find that it was effective. A corporate officer requested it and acquiesced to its implementation. CPL 600.10 provides that the delivery of a summons or appearance ticket to an officer will effect service upon his or her defendant corporation and require the corporation to appear before a court for the purpose of commencing a criminal action. "Upon failure of appearance at the time such defendant is required to enter a plea to the accusatory instrument, the court may enter a plea of guilty and impose sentence.” (CPL 600.20.) To put it another way, there is no requirement that the summons or appearance ticket be served upon or answered by an attorney before a judgment against the defendant corporation may be entered. In this case, the request for and acquiescence in the substitution by the corporate defendant through its vice-president, Winston Barrow, is a consent to the court’s exercising jurisdiction over the corporate defendant and a waiver of the formality of serving the appearance ticket or summons. As would have been the case had service of process been made on the corporation, the appearance of the corporation by an attorney would not have been necessary before a judgment could be entered.

. Evidence adduced at the sentencing hearing makes clear that at the time of the plea defendant had, in fact, done nothing to remedy the Buildings Department violations that are the subject of this prosecution. It should be noted, moreover, the defendant has not in this motion challenged the sufficiency of the plea allocution or claimed that his admission of guilt was equivocal.

. The basis for the defendant’s assertion that curing the violations was "economically unreasonable” remains unclear. The estimated market value of 215 and 217 before rehabilitation and when occupied by rent-regulated tenants was $168,000. There was no testimony about how much was paid for the two buildings when purchased by McChip. Given these facts, defendant has failed to make any showing that the cost of curing the violations would have been prohibitive or confiscatory.